# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 11-1284

_____

Maizie Avichail, By next friend T.A.,   *
a minor,   *
  *
       Appellant,   *
  *   Appeal from the United States
   v.   *   District Court for the
  *   Eastern District of Missouri.
St. John's Mercy Health System, a   *
Missouri non-profit corporation, doing   *
business as St. John's Mercy Medical   *
Center; Geraldine Jones; Fastaff, Inc., a   *
Colorado Corporation, doing business   *
as Fastaff Travel Nursing,   *
  *
       Appellees.   *

_____

Submitted: December 14, 2011
Filed: July 24, 2012

_____

Before WOLLMAN, MELLOY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Maizie Avichail brought a medical malpractice action as next friend of T.A., her minor daughter. There were three defendants: St. John's Mercy Medical Center; Geraldine Jones, a nurse involved in T.A.'s care; and Fastaff, Inc., Jones's employer.

A jury found for the defendants, and the district court[1] denied Avichail's motion for a new trial. Avichail appeals, arguing that the district court committed reversible error in its conduct of the trial. We affirm.

I.

T.A. suffered from Beckwith-Wiedmann Syndrome, which causes macroglossia, a condition in which the tongue is abnormally large. In July 2003, St. John's admitted T.A. for tongue reduction surgery, which required that she be placed under general anesthesia. Following the procedure, T.A. was admitted to St. John's Pediatric Intensive Care Unit. Her surgeon, Dr. Jeffrey Marsh, sent written instructions for the staff to monitor her oxygen levels continuously and to notify him if oxygen saturation fell below 90%. Avichail alleges that despite these instructions, T.A.'s oxygen levels went unmonitored for ten hours, during which time her oxygen saturation plummeted from 94% to 50%. According to Avichail, the loss of oxygen flow to T.A. caused irreparable brain damage. She alleges that, as a result, T.A. needs constant supervision and is permanently limited in her ability to advance in school.

Avichail sued the three defendants, and the case proceeded to trial. During jury selection, Avichail sought to exercise a peremptory strike against Juror No. 17. Citing *Batson v. Kentucky*, 476 U.S. 79 (1986), counsel for Jones objected on the ground that both the challenged juror and his client are African-American. Counsel for St. John's joined the challenge, and the district court asked Avichail's attorney to provide a race-neutral explanation for striking the juror. Counsel responded:

> I'll tell the Court as I'm going through these and until counsel mentioned it, I had forgotten that she's of African-American descent. . . . It's simply not something I think about, so that wasn't into it. The

---

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

reason I struck her is she has some college.  She gave us very little information; only hobby is swimming.  She just didn't seem to me to be a person who was involved enough to be able to understand what is going on in this case.

The district court then examined whether the pool of unchallenged jurors included any non-African Americans who were otherwise similarly situated to Juror No. 17.  After concluding that there were such jurors, the court announced its ruling:

The decision is based as follows:  The reasons stated of themselves were race neutral.  The issue then becomes whether or not someone who is not of the African-American race remained on the jury with the same—or other jurors with the same or similar circumstances that were assigned as race neutral reasons.  There were several jurors.  I note Juror No. 2 specifically said that she didn't have anything to say at all, and there were others with "some college."  So the ruling will be that the burden has been carried.

The district court then denied the peremptory strike and asked Avichail's counsel to select another juror.

At trial, Avichail called as a witness Josephine Carolino, T.A.'s caregiver for over eleven years, who grew up in the Philippines.  Because Carolino's native language is Tagalog, Avichail asked the court to permit testimony through an interpreter.  To ascertain Carolino's facility with English, the court asked her basic questions outside the jury's presence.  Based on her answers, the court was satisfied that she understood English.  The jury was returned to the courtroom, and Carolino began her testimony without the assistance of an interpreter.  After examining Carolino for a period, Avichail's attorney requested a sidebar, where he renewed his concern that Carolino was unable to comprehend some of his questions.  The jury was sent out again, and the court allowed Avichail's counsel to use an interpreter to help Carolino clarify her testimony.  Once the questioning concluded, the court ruled that

Carolino would continue her testimony before the jury in English. The court expressed concern that because Carolino's deposition had been conducted in English, the use of an interpreter at trial might cause the jury to discredit her prior statements as the result of a language barrier.

The jury ultimately found in favor of the three defendants. Avichail raises two issues on appeal: first, that the district court erroneously sustained the *Batson* challenge to her peremptory strike of Juror No. 17, and second, that the court improperly denied Carolino the opportunity to testify through an interpreter.

II.

*Batson* established that the Equal Protection Clause bars purposeful racial discrimination by a State in the selection of a criminal jury. *See* 476 U.S. at 86. This principle now applies to civil cases as well as criminal prosecutions, and it applies to the federal government through the Due Process Clause. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991). A three-step process guides the determination of whether a *Batson* violation occurred:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003) (internal citations omitted).

We have some doubt whether the district court correctly applied the law in ruling on the peremptory strike. The court seemed to conclude that because Avichail did not strike a white venireperson who was similarly situated to Juror No. 17,

-4-

Avichail's strike of Juror No. 17 was unconstitutional.  In a similar vein, the court's post-trial order denying a motion for new trial explained the ruling as follows:  "This Court ultimately determined that similarly situated potential jurors of another race were not challenged, *and thus* granted Defendants Jones and Fastaff, Inc's *Batson* challenge."  R. Doc. 176, at 4 (emphasis added); *see also id*. at 6 ("[T]he Court finds that there was *sufficient evidence* to conclude that Plaintiff's race-neutral explanation was pretextual.") (emphasis added).

To rule that a strike is unconstitutional, however, the court must find that the party challenging the strike has shown purposeful discrimination.  Differential treatment of similarly situated venirepersons may support an inference that the strike was motivated by race, *see Miller-El v. Dretke*, 545 U.S. 231, 241 (2005), but it does not require that conclusion.  *Cf. Nicklasson v. Roper*, 491 F.3d 830, 842 (8th Cir. 2007) ("Although the inconsistent application of a prosecutor's peremptory challenge rationale between similarly situated white and black jurors constitutes evidence of purposeful discrimination, there is not, nor should there be, a per se rule stating that the presence of such evidence alone must always constitute 'clear and convincing' evidence.") (internal citation omitted).  In the process of exercising the limited number of peremptory strikes that are allotted by rule, a party may face a choice among similarly situated venirepersons who share race-neutral characteristics that the party views as less than optimal.  "[P]otential jurors are not products of a set of cookie cutters," however, so even "similarly situated" jurors will not be identical in all respects.  *Miller-El*, 545 U.S. at 247 n.6.  The Constitution does not forbid a party to strike some of these jurors and not others, so long as the strikes are not exercised on account of race.  Therefore, the court must make a finding about motivation in order to resolve a challenge to a peremptory strike.  The court here did say that "the burden has been carried," but the court may have conflated the initial burden to show that a similarly situated venireperson remained on the jury and the ultimate burden to establish purposeful discrimination.

If there was error, however, we conclude that it was harmless. A constitutional violation arising from the *racially-motivated exercise* of a peremptory strike is a structural defect in a trial that requires automatic reversal. *Batson*, 476 U.S. at 86; *Ford v. Norris*, 67 F.3d 162, 171 (8th Cir. 1995). But the same is not true of a good-faith but erroneous denial of a peremptory strike. As the Supreme Court explained in *Rivera v. Illinois*, 556 U.S. 148 (2009), "[b]ecause peremptory challenges are within the States' province to grant or withhold, the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution." *Id.* at 158. This case arises under federal law, but the distinction between sovereigns does not change the analysis. Peremptory strikes in a federal civil case are authorized by 28 U.S.C. § 1870 and Federal Rule of Civil Procedure 47(b), not commanded by the Constitution.

We acknowledge that *Rahn v. Hawkins*, 464 F.3d 813 (8th Cir. 2006), concluded that an erroneous deprivation of a peremptory challenge in a federal civil case amounted to "structural error" that defied harmless error analysis and required automatic reversal if preserved. *Id.* at 819. *Rahn* relied on language from *Swain v. Alabama*, 380 U.S. 202 (1965), where the Court said that the denial or impairment of the right to peremptory challenges "is reversible error without a showing of prejudice." *Id.* at 219. This court in *Rahn* thought the mistake affected the "very 'constitution of the trial mechanism,'" such that there is "no way to tell what would have been the result had the error not occurred." 464 F.3d at 819 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)).

The reasoning of *Rahn*, however, was superseded by *Rivera*, and we therefore need not follow *Rahn*. *See T.L. ex rel. Ingram v. United States*, 443 F.3d 956, 960 (8th Cir. 2006). In *Rivera*, 556 U.S. at 160, the Supreme Court explained that *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), had disavowed the statement in *Swain* on which *Rahn* relied. *Martinez-Salazar* said that "the oft-quoted language in *Swain* was not only unnecessary to the decision in that case . . . but was founded on

a series of our early cases decided long before the adoption of harmless-error review." 528 U.S. at 317 n.4. *Rivera* also declared that a mistaken denial of a peremptory challenge does not necessarily render a trial "fundamentally unfair or an unreliable vehicle," 556 U.S. at 160 (internal quotation omitted), and does not rise to the level of "*constitutional* errors concerning the qualification of the jury or judge" that necessitate reversal. *Id.* at 161. We therefore conclude in light of *Rivera* that a federal court's erroneous denial of a peremptory strike is subject to harmless-error analysis. *See United States v. Lindsey*, 634 F.3d 541, 547-550 (9th Cir. 2011); *United States v. Gonzalez-Melendez*, 594 F.3d 28, 33-34 (1st Cir. 2010).

Assuming it was error to deny the strike of Juror No. 17, we conclude that the error was harmless. Nothing in the record suggests that Juror No. 17 was removable for cause or otherwise unqualified for jury service. Although the jury seated at trial was constituted differently than if Juror No. 17 had been stricken, the jury was qualified and impartial. There was thus no violation of Avichail's constitutional rights. As for the potential violation of the statute and Rule 47(b), there is no basis in the record to conclude that the change in composition of the jury substantially influenced the verdict. *See* Fed. R. Civ. P. 61; *cf. Gonzalez-Melendez*, 594 F.3d at 33-34.

It is also significant that "there is no suggestion here that the trial judge repeatedly or deliberately misapplied the law or acted in an arbitrary or irrational manner." *Rivera*, 556 U.S. at 160. The availability of harmless-error analysis is not license for trial judges to implement their own notions of ideal jury composition under the guise of enforcing the guarantees of equal protection and due process of law. *See Chinnery v. Virgin Islands*, No. 2009-0037, 2011 WL 3490267, at *7 (V.I. May 27, 2011) (granting a new trial based on denial of a peremptory strike where the trial court ruled "based on its own personal preferences rather than a good-faith attempt to follow *Batson*"); *Pellegrino v. AMPCO Sys. Parking*, 785 N.W.2d 45, 49, 57 (Mich. 2010) (granting a new trial where the trial judge denied a peremptory strike

after saying that "until either removed from the bench by the disciplinary committee or ordered to have a new trial, I am going to seek to have this proportional representation on the juries that hear cases in this court"). But there is no hint of such motivation here. The district court may have erred in denying the strike without making a finding of discriminatory purpose, but we are confident that any error was "a one-time, good-faith misapplication of *Batson*." *Rivera*, 556 U.S. at 160.

III.

Avichail also argues that the district court abused its discretion by refusing to allow Carolino to testify through an interpreter. District courts have wide discretion in determining whether to allow the use of an interpreter during trial, *see United States v. Nguyen*, 526 F.3d 1129, 1134 (8th Cir. 2008), and we think the district court's ruling was sound.

Carolino did exhibit some confusion at first in responding to direct examination about the chronology of events. But after receiving assistance from an interpreter outside the presence of the jury, she rectified the earlier difficulty and presented clear and responsive testimony on the order of events. Avichail cites other instances from Carolino's testimony that allegedly illustrate the witness's confusion. To be sure, Avichail's attorney sometimes found it necessary or helpful to rephrase or repeat a question, but these occurrences do not establish that Carolino "obviously neither spoke nor understood the English language, or, despite some limited ability, clearly had difficulty." *Luna v. Black*, 772 F.2d 448, 451 (8th Cir. 1985) (per curiam). The transcript reflects that while Carolino's answers were not always precise, she eventually was responsive and demonstrated adequate comprehension of counsel's inquiries. The district court also expressed a reasonable concern that Carolino's reliance on an interpreter during trial might cause the jury to discount her deposition testimony, which was taken without interpretive assistance and used during her

examination at trial.  The district court thus did not abuse its discretion in declining to permit an interpreter during the trial.

\* \* \*

For the foregoing reasons, the judgment of the district court is affirmed.

_____